**PRAIRIE PRODUCTION, INC.,**
**Appellant, (Plaintiff below),**

v.

**AGCHEM DIVISION–PENNWALT COR-**
**PORATION and MBM Helicopter Ser-**
**vice, Inc., Appellees, (Defendants be-**
**low).**

No. 23A01–8612–CV–351.

Court of Appeals of Indiana,
First District.

Nov. 19, 1987.
Rehearing Denied Dec. 22, 1987.

Stephen E. Yeager and Donald M. Clementson-Mohr, Cooke Bache Moore, Laszynski & Yeager, Lafayette, for appellant.

Arthur P. Kalleres, Debra H. Miller, Ice Miller Donadio & Ryan, Indianapolis, for appellees.

ROBERTSON, Judge.

Appellant-plaintiff Prairie Production, Inc. (PPI) appeals from the trial court's entry of summary judgment in favor of appellee-defendant Agchem Division-Pennwalt Corp. (Pennwalt). MBM Helicopter Service is not a party to this appeal.

We affirm in part and reverse in part.

PPI is a seed growing company in Indiana. Around August 15, 1984, the president of PPI, Stephen Ratcliff, spoke with John Townsend of MBM about the infestation of corn earworms in PPI's seed corn crop. MBM applies pesticides by helicopter to crops. In their discussion regarding the product which MBM should apply, Townsend suggested the use of Penncap-M, a micro-encapsulated pesticide manufactured by Pennwalt. Penncap–M is a restricted use pesticide which may only be sold to, and applied by, licensed applicators such as Townsend.

Townsend had received product information about Penncap-M from Pennwalt in the past. Included in this information was a label update, describing the pests for which the product was effective. The label stated that Penncap-M was effective against corn earworms. After his conversation with PPI's Ratcliff, Townsend contacted Bill Smith, a sales representative for Pennwalt, to discuss the use of Penncap-M in reducing corn earworms. Smith informed Townsend of expected "kill" percentages of corn earworms with Penncap-M. Townsend then told Ratcliff what Smith had represented. Pennwalt also disseminated information about Penncap-M and its effectiveness by way of sample labels, brochures, and written advertisements appearing in trade magazines, including *Seedmen's Digest.* This information was sent to growers and farmers as well as to applicators, and stated that Penncap-M was effective against corn earworms.

MBM sprayed PPI's growing seed corn with Penncap-M on August 18, 1984 and again on August 20, 1984. MBM billed PPI for the application and for the Penncap-M. Subsequently, PPI lost a portion of its seed corn crop to corn earworms.

PPI's complaint against Pennwalt and MBM read in three counts, alleging breach of express warranties, breach of implied warranties and negligence of Pennwalt in the manufacture, sale, labeling and distribution of Penncap-M. PPI is seeking damages solely for loss of profits occasioned by the failure of Penncap-M to control corn earworms.

The trial court granted Pennwalt's motion for summary judgment, finding that there was no privity of contract between PPI and Pennwalt with respect to the sale of Penncap-M and concluding that PPI did not have a cause of action against Pennwalt on the warranty theories. The court also found that PPI may not recover against Pennwalt on the negligence claim for purely economic loss. PPI appeals from the adverse judgment.

We have consolidated PPI's three issues into the following two:

I. Does the absence of privity of contract between PPI and Pennwalt in the sale of Penncap-M bar recovery under the theories of implied and express warranties?

II. May PPI recover purely economic damages on its negligence claim against Pennwalt?

We begin our discussion of the issues by stating our oft-repeated standard of review with respect to summary judgment. On appeal, this court applies the same standard of review as does the trial court. We look to determine whether any genuine issue of material fact exists and whether the law was correctly applied. In determining whether a genuine issue of material fact exists, we accept as true all facts set forth by the non-moving party and resolve all doubts against the movant. Only where there is no dispute as to the material facts or the inferences to be drawn therefrom,

and the moving party is entitled to summary judgment as a matter of law, may the court grant such a motion. *Naughgle v. Feeney-Hornak Shadeland Mortuary* (1986), Ind.App., 498 N.E.2d 1298.

## ISSUE I

Implied warranty

■ PPI asserts that technical privity with Pennwalt is not required in order to maintain a cause of action based on the implied warranty of merchantability and on other implied warranties. The parties do not dispute that there was no privity of contract between PPI and Pennwalt. In fact, the record establishes that MBM purchased Penncap-M from G & W Spreading Company, an applicator of pesticides, who had purchased it from Strong & Strong, apparently a distributor of Penncap-M.

Indiana has adhered to the general rule that implied warranties, as they relate to economic loss from the bargain, cannot ordinarily be sustained between the buyer and a remote manufacturer. *Richards v. Goerg Boat and Motors, Inc.* (1979), 179 Ind.App. 102, 384 N.E.2d 1084; *Candlelight Homes, Inc. v. Zornes* (1981), Ind. App., 414 N.E.2d 980; *Dutton v. International Harvester* (1987), Ind.App., 504 N.E.2d 313; *Ridge Co., Inc. v. NCR Corp.* (N.D.Ind.1984), 597 F.Supp. 1239.

In support of its argument, PPI refers us to several cases in which a remote manufacturer was found to be liable for economic loss to the buyer on a theory of implied warranty. First, it points to the result in *Richards v. Goerg Boat and Motors, Inc.,* *supra*. In *Richards*, this court found that summary judgment was improper against Richards, the buyer of a houseboat, because the court found there were factors which were sufficient to bring Kenner, the manufacturer of the boat, into the transaction directly as a seller. Richards had purchased the boat from Goerg, who was a dealer. When he purchased the boat, Richards made payment directly to Goerg. However, Richards talked with Kenner personnel at a boat show, and had attended a demonstration and inspection at the Kenner plant. Richards dealt directly with

Kenner concerning problems with the boat. Kenner assured Richards that the boat "would be made right" in order to consummate the sale. The court concluded from this evidence that Kenner had entered the transaction directly as a seller. *Richards, supra,* 384 N.E.2d at 1092.

In *Thompson Farms, Inc. v. Corno Feed Products* (1977), 173 Ind.App. 682, 366 N.E.2d 3 the court permitted the plaintiff Thompson Farms to recover economic loss on an implied warranty because it found a special agency relationship between Triple T, a dealer in Corno's "plan," and Corno, the manufacturer of hog feeder houses. The special agency was implied from evidence that Triple T's function was to bring about, between Corno and a customer, a contractual relationship which would provide financing to increase the customer's investment in hog production in exchange for an agreement to buy Corno's feeds. *Thompson, supra,* 366 N.E.2d at 11. Also, Corno had solicited Thompson Farms directly as a customer for the hog houses and had inspected the units for conformity to Corno blueprints, thereby meeting the U.C.C. definition of a seller. *Thompson, supra,* 366 N.E.2d at 14.

PPI urges that, as in *Richards* and *Thompson*, Pennwalt significantly participated in the sale of Penncap-M to PPI, since it disseminated product labels and advertising brochures to growers, making Pennwalt a "seller" under the U.C.C., IND. CODE 26-1-2-103(d). We disagree. Pennwalt had never directly contacted PPI; all the discussions leading to the sale of Penncap-M were between PPI and MBM. PPI makes no argument that we should find an implied agency relationship between Pennwalt and MBM. Indeed the consultation which Townsend had with Bill Smith could not constitute even a special agency relationship described in *Thompson, supra.* No agency is established where the evidence shows merely that an immediate seller is a dealer of the manufacturer's product. *Candlelight,* 414 N.E.2d at 982. Here, MBM is not even a dealer in Pennwalt's products, but merely consulted with the manufacturer on the subject of the

proper application of the product and its effectiveness against corn earworms. Therefore, we hold that Pennwalt did not directly participate in the sale of Penn-cap-M to PPI, nor were there any facts from which a trier of fact could find an implied agency or special agent relationship between MBM and Pennwalt. It follows that, in conformance with the general rule, PPI could not maintain a suit for breach of implied warranties, claiming damages for only economic loss against Pennwalt, a remote manufacturer.

Express Warranty

 In Count II of its complaint, PPI alleged that Pennwalt expressly warranted by written and oral affirmations that Penn-cap-M would control corn earworms. PPI claimed damages in the form of economic loss as a result of Pennwalt's breach of these express warranties. Specifically, PPI averred that statements of Penncap–M's effectiveness contained in advertisements, brochures and product labels were express warranties made by Pennwalt. As in our previous discussion on implied warranties, the fundamental question here is whether PPI may maintain its cause of action for breach of express warranties against a manufacturer not in privity with PPI. Indiana has not squarely faced this question to date. For the reasons stated below, we hold that PPI is not precluded from suing Pennwalt because of lack of privity of contract, where Pennwalt allegedly made express warranties to PPI.

Although we rely principally on the seminal case cited by PPI, *Randy Knitwear v. American Cyanamid Co.* (1962), 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399, the authority in favor of discarding the privity requirement in express warranty cases is overwhelming. The New York court in *Randy Knitwear* was called upon to decide whether privity of contract is essential to maintaining an action against a manufacturer for breach of express war-

ranty. In that case, American Cyanamid manufactured chemical resins, under the trademark "Cyana" which were used in the textile industry to render fabrics shrinkproof. Apex Knitted Fabrics and Fairtex Mills were manufacturers of fabrics who were authorized by Cyanamid to treat their fabrics with "Cyana," and to sell their fabrics with a label stating that the fabric was "Cyana" finished. Randy Knitwear, a maker of children's clothing, purchased "Cyana" treated fabrics from Apex and Fairtex, and used the fabrics to make clothing to be sold to customers. Users of the clothing reported that after washing, the clothing shrank and lost its shape. After Randy Knitwear brought its complaint against Cyanamid, Fairtex and Apex for breach of express warranty, Cyanamid moved for summary judgment, urging lack of privity.

*Randy Knitwear* is strikingly similar to the instant case with respect to the type of advertising carrying the manufacturer's affirmations. Cyanamid's statements of "Cyana's" qualities appeared in advertisements in trade journals and in direct mail pieces to clothing manufacturers, and in labels or garment tags furnished to Fairtex and Apex, and passed by them to garment manufacturers like Randy Knitwear. Randy Knitwear attached the labels bearing Cyanamid's name to its finished garments.

The court began its discussion by noting that the requirement of technical privity should be dispensed with when the "interests of justice and reason" demand it. *Id.* 226 N.Y.S.2d at 366, 181 N.E.2d at 401. It justified discarding the privity requirement under the circumstances of that case by observing that manufacturers commonly extoll the merits and quality of their products in newspapers, periodicals and other media directed to each purchaser in the chain of distribution. These affirmations, which may or may not constitute an express warranty,[1] may effectively induce the

---

**1.**

(1) Express warranties by the seller are created as follows:

(a) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the

bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) any description of the goods which is made part of the basis of the bargain creates

purchase, and are even intended to have that effect. *Id.,* 226 N.Y.S.2d at 367, 181 N.E.2d at 402. The court held that privity was not required in order for Randy Knitwear to maintain its suit against Cyanamid. The court refused to limit its holding to cases in which the breach of warranty results in personal injury, because the basis of liability turns upon the representations made to the buyer and not upon the character of the product. *Id.,* 226 N.Y.S.2d at 369, 181 N.E.2d at 404.

We see little which distinguishes *Randy Knitwear* from the instant case [2] and we agree with the rationale given for the holding. Pennwalt asserts that the general privity rule is so well ensconced in Indiana law that it may not be shaken loose even in a case similar to *Randy Knitwear.* (Pennwalt does not attempt to distinguish the cases factually.) To the contrary, we have found language in an Indiana case which implies that lack of privity would not be fatal in express warranty cases. In *Candlelight Homes v. Zornes, supra,* the court reversed the verdict in favor of the purchaser who had alleged breach of implied warranties and who was not in privity with the manufacturer. The court cited White and Summers, Uniform Commercial Code at 333 (1972):

> "The courts are split on whether a plaintiff may recover economic loss (loss of bargain and loss of profits) from a seller with whom he did not deal *and who made no express warranties to him."* (Emphasis added).

After concluding that Zorneses could not prevail on their implied warranty theory, Judge Neal addressed Zorneses' argument that the case was tried under the theory of express warranty running from Fairmont,

the manufacturer, to Zorneses. The court concluded that the case was not tried on an express warranty theory, and that there was no evidence in the record of representations made by Fairmont. Seemingly, the lack of privity was not deemed consequential for the express warranty claim. The court concluded that "no privity existed between Fairmont and Zorneses to create a basis of liability for breach of implied warranty" and there was insufficient evidence of express warranty.

Other jurisdictions have followed the lead of *Randy Knitwear.* The following cases state that a plaintiff may recover against a manufacturer for economic loss for breach of express warranties, even though the plaintiff is not in privity with the manufacturer: *Whitaker v. Farmhand, Inc.* (1977), 173 Mont. 345, 567 P.2d 916; *Flory v. Silvercrest Industries, Inc.* (1981), 129 Ariz. 574, 633 P.2d 383; *Koperski v. Husker Dodge, Inc.* (1981), 208 Neb. 29, 302 N.W.2d 655; *Kinlaw v. Long Mfg. N.C., Inc.* (1979), 298 N.C. 494, 259 S.E.2d 552; *Inglis v. American Motors* (1965), 3 Ohio St.2d 132, 209 N.E.2d 583; *Scheuler v. Aamco Transmissions* (1977), 1 Kan. App.2d 525, 571 P.2d 48 (stating the general rule without distinguishing between personal injury damages and economic loss).

▇▇▇ The question whether advertising literature contains affirmations of fact constituting express warranties is a jury question. *Peterson v. North American Plant Breeders* (1984), 218 Neb. 258, 354 N.W.2d 625. Whether oral affirmations amount to an express warranty is also a question of fact. *Art Hill, Inc. v. Heckler* (1984), Ind. App., 457 N.E.2d 242. We hold that the pleadings, interrogatories, and testimony given at the summary of judgment hearing

---

an express warranty that the goods shall conform to the description.

(c) any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or com-

mendation of the goods does not create a warranty. IC 26–1–2–313.

2. In *Randy Knitwear,* the plaintiff was not the ultimate purchaser of the Cyana-treated fabrics; it made the fabric into clothing for consumers to purchase and wear. In the instant case, PPI was the ultimate consumer of Penncap-M; however, we do not believe this variance undermines the force of the holding in *Randy Knitwear.*

created a genuine issue of material fact with respect to the question whether the oral affirmations communicated to MBM's Townsend, and written affirmations contained in trade journals and product labels, created an express warranty made by Pennwalt to PPI. As part of its determination, the jury must resolve the question of whether the seller's representation became part of the basis of the bargain. I.C. 26–1–2–313. Under Indiana law, the seller's representation rises to the level of an express warranty only if it becomes part of the basis of the bargain. *Gorman v. Saf–T–Mate* (N.D.Ind.1981), 513 F.Supp. 1028, 1038. Accordingly, the trial court's granting of summary judgment in favor of Pennwalt on count II of PPI's complaint is reversed.

### ISSUE II

■ PPI's second issue presents the question of whether the law of negligence permits recovery by a purchaser of goods against a remote manufacturer for damages constituting solely economic loss. The only loss which PPI claims is loss of profits from the seed corn ruined by corn earworms when Penncap-M failed to control those pests. "Economic loss" designates the diminution in the value of a product and consequent loss of profits because the product is inferior in quality and does not work for the general purposes for which it was manufactured and sold. *Sanco, Inc. v. Ford Motor Co.* (N.D.Ind., 1984) 579 F.Supp. 893; aff'd. 771 F.2d 1081 (7th Cir.1985). Seizing upon this definition of economic loss, PPI directs us to several Indiana cases which hold, generally, that Indiana permits recovery of lost profits in a negligence case. *Babson v. Tipstar* (1983), Ind.App., 446 N.E.2d 11; *Indiana Bell Telephone Co., Inc. v. O'Bryan* (1980), Ind. App., 408 N.E.2d 178. However, the above authorities fall short of addressing the fundamental question here: may PPI recover economic losses in the form of lost profits when the alleged economic loss flows from the failure of a product to perform as it was expected? We hold that PPI may not.

In so holding, we join the majority of jurisdictions which follow the rule in *Seely*

*v. White Motor Co.* (1965), 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145. In that case, the plaintiff sued for lost profits and the purchase price of a defective truck. In concluding that the plaintiff could only have recovered lost profits under the express warranty, Justice Traynor discussed the need to keep products liability and warranty remedies discrete:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injury and there is no recovery for economic loss alone.

45 Cal.Rptr. at 23, 403 P.2d at 151 (Citations omitted.)

Stated another way, a manufacturer does not owe a duty to avoid causing purely economic damage. *See East River Steamship Corp. v. Transamerica Delaval, Inc.* (1986), 476 U.S. 858, ——, 106 S.Ct. 2295, 2304, 90 L.Ed.2d 865, 880. There are several justifications for adhering to the rule announced in *Seely*. First, the law of sales set out in Article 2 of the Uniform Commercial Code governs the economic rela-

tions between buyer and seller, and the dissatisfied buyer may avail himself of the remedies fashioned by the legislature. *Moorman Manufacturing Co. v. National Tank Co.* (1982) 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443. If a buyer could recover economic loss under a negligence theory, he could circumvent the seller's effective limitation or exclusion of warranties under section 2–316 of the UCC. (I.C. 26–1–2–316), *Moorman, supra* 61 Ill.Dec. at 750, 435 N.E.2d at 447; *Sanco, supra* at 897. Also, relegating the purchaser to warranty remedies prevents a manufacturer from being held liable for damages of unknown and unlimited scope. *Moorman, supra,* 61 Ill.Dec. at 750, 435 N.E.2d at 447; *Seely,* 63 Cal.2d 9, 16, 403 P.2d 145, 150, 45 Cal.Rptr. 17, 22.

While we acknowledge the persuasive force of the decisions espousing the opposing view,[3] we believe the majority rule is more sound, particularly as we consider the negligence action in the instant case. PPI's Count I alleges that Penncap-M failed to control corn earworms and that such failure was caused by Pennwalt's negligent manufacture, sale, distribution, and labeling of Penncap-M, and by its negligence in instructing others in its use. The trial court disposed of the entire complaint on Pennwalt's motion for summary judgment, but PPI's entire argument on this issue centers on the negligent labeling of Penncap-M.

PPI argues that it has made out a prima facie case of negligence per se because our pesticide control statute, I.C. 15–3–3.5–3(5), prohibits the distribution or sale of any pesticide which is adulterated or misbranded.[4] It contends that this provision creates a duty, independent of any concerns of the U.C.C.'s Article 2 not to make false representations on pesticide labels. Consequently, it argues, it should be able to recover as did the plaintiff in *Eby v. York Division, Borg-Warner* (1983), Ind.App., 455 N.E.2d 623. The plaintiff in *Eby* sought damages under a theory of negligent misrepresentation (among other theories) as a result of Eby's relying upon representations of employees of Borg-Warner that a position with the company was reserved for Eby in Florida.

*Eby* did not involve a sale of goods. Consequently, that case does not sway us from our opinion that the instant case is more properly resolved under the warranty provisions of the U.C.C.

Moreover, in our judgment I.C. 15–3–3.5–3(5) does not create a duty upon a manufacturer to avoid causing purely economic harm when its pesticide fails to control the pest which the label states it will control. As we read the pesticide act, it is concerned with preventing harm to the environment through the careless use of pesticides. *See particularly* I.C. 15–3–3.5–11; 15–3–3.5–33; 15–3–3.5–34. Similar provisions in the Illinois Pesticide Act are preceded by a statement of purpose, declaring that pesticides must be regulated "to prevent adverse effects on man and his environment." Ill.Ann.Stat. ch. 5, § 801 *et seq.* (Smith

---

3. *Berg v. General Motors Corp.* (1976), 87 Wash.2d 584, 555 P.2d 818; *Omni Flying Club v. Cessna Aircraft Co.* (1974), 366 Mass. 154, 315 N.E.2d 885; *State ex rel Western Seed Production Corp. v. Campbell* (1968), 250 Or. 262, 442 P.2d 215; *Spence v. Three Rivers Builders & Masonry Supply* (1958), 353 Mich. 120, 90 N.W.2d 873. These courts allowed recovery for economic loss on a negligence theory. The *Western Seed* court found no serious conflict with the sales provisions of the UCC, reasoning that fault is an element of negligence, and under the UCC recovery may be had without any fault of the seller. *Id.,* 442 P.2d at 218. Both *Western Seed* and *Berg, supra,* found that a manufacturer owed a duty not to introduce faulty products into the stream of commerce which would

impair a purchaser's commercial enterprise. In our view, imposing such a duty of care on a manufacturer would result in higher prices to the consuming public so that a manufacturer could insure against the possibility that some of its products will not meet the business needs of his customers. E.g. *Moorman, supra,* 61 Ill.Dec. at 751, 435 N.E.2d at 448.

4. I.C. 15–3–3.5–2(19) states that the term "misbranded" shall apply: "(a) to any pesticide or device if its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular."

Hurd 1975). Therefore, PPI has not established any duty created by statute in support of its contention that an "independent tort" was committed.

PPI's negligence claim arises out of the failure of Penncap-M to meet its business needs. We have concluded that PPI may not recover its economic losses under a negligence theory; therefore, summary judgment on Count I was proper. However, as we stated under Issue I, the court erred in granting summary judgment on PPI's express warranty claim.

Reversed in part and affirmed in part.

RATLIFF, C.J., and NEAL, J., concur.